**Fill in this information to identify the case:**

Debtor 1    Patrick Reeder

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:   Middle District of Pennsylvania

Case number   20-00997

## Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must **leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

HUNTINGTON NATIONAL BANK
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

HUNTINGTON NATIONAL BANK
Name

PO BOX 89424
Number    Street

CLEVELAND    OH    44101
City    State    ZIP Code

Contact phone   888-632-5547

Contact email   bankruptcy@huntington.com

**Where should payments to the creditor be sent? (if different)**

HUNTINGTON NATIONAL BANK
Name

5555 CLEVELAND AVE GW1N10
Number    Street

COLUMBUS    OH    43231
City    State    ZIP Code

Contact phone   888-632-5547

Contact email   bankruptcy@huntington.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ — _ _ _ _ — _ _ _ _ — _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
   MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| | | |
|---|---|---|
| 6. | Do you have any number you use to identify the debtor? | ☐ No<br>☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: __9__ __6__ __9__ __1__ |

7. How much is the claim? $_____195,584.59. **Does this amount include interest or other charges?**

☐ No
☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. What is the basis of the claim?

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

MONEY LOANED _____

9. Is all or part of the claim secured?

☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: 17 W CHESTNUT ST   MOUNT UNION PA 17066 _____

**Basis for perfection:** MTG & PLA _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

| | |
|---|---|
| **Value of property:** | $_____ |
| **Amount of the claim that is secured:** | $_____195,584.59 |
| **Amount of the claim that is unsecured:** | $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.) |

**Amount necessary to cure any default as of the date of the petition:** $_____0.00

**Annual Interest Rate** (when case was filed)__5.87__ %
☐ Fixed
☑ Variable

10. Is this claim based on a lease?

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. Is this claim subject to a right of setoff?

☑ No
☐ Yes. Identify the property: _____

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.

$_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  03/25/2020
　　　　　　　　　 MM / DD / YYYY

/S/Mary Stosic
Signature

Print the name of the person who is completing and signing this claim:

Name  MARY STOSIC
　　　 First name　　　Middle name　　　Last name

Title  REAL ESTATE SPECIALIST

Company  HUNTINGTON NATIONAL BANK
　　　　 Identify the corporate servicer as the company if the authorized agent is a servicer.

Address  5555 CLEVELAND AVE GW1N10
　　　　 Number　　　Street

　　　　 COLUMBUS　　　　　　OH　　　43231
　　　　 City　　　　　　　　　State　　ZIP Code

Contact phone  888-632-5547　　　　　Email  bankruptcy@huntington.com

# Mortgage Proof of Claim Attachment

(12/15)

If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See separate instructions.

## Part 1: Mortgage and Case Information

| | |
|---|---|
| Case number: | 20-00997 |
| Debtor 1: | Patrck Reeder |
| Debtor 2: | |
| Last 4 digits to identify: | 9691 |
| Creditor: | The Huntington National Bank |
| Servicer: | |
| Fixed accrual/daily simple interest/other: | 5 87 variable |

## Part 2: Total Debt Calculation

| | |
|---|---|
| Principal balance: | $ 194,368 83 |
| Interest due: | $ 1,215 76 |
| Fees, costs due: | |
| Escrow deficiency for funds advanced: | |
| Less total funds on hand: | – |
| Total debt: | $ 195,584 59 |

## Part 3: Arrearage as of Date of the Petition

| | |
|---|---|
| Principal & interest due: | |
| Prepetition fees due: | |
| Escrow deficiency for funds advanced: | |
| Projected escrow shortage: | |
| Less funds on hand: | – |
| Total prepetition arrearage: | $ 0 00 |

## Part 4: Monthly Mortgage Payment

| | |
|---|---|
| Principal & interest: | $ 904 03 |
| Monthly escrow: | |
| Private mortgage insurance: | |
| Total monthly payment: | $ 904 03 |

## Part 5 : Loan Payment History from First Date of Default

| | Account Activity | | | | | | How Funds Were Applied/Amount Incurred | | | | | Balance After Amount Received or Incurred | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **A.** Date | **B.** Contractual payment amount | **C.** Funds received | **D.** Amount incurred | **E.** Description | **F.** Contractual due date | **G.** Prin, int & esc past due balance | **H.** Amount to principal | **I.** Amount to interest | **J.** Amount to escrow | **K.** Amount to fees or charges | **L.** Unapplied funds | **M.** Principal balance | **N.** Accrued interest balance | **O.** Escrow balance | **P.** Fees / Charges balance | **Q.** Unapplied funds balance |
| | | | | | | | | | | | | | | | | |

Case 1:20-bk-00997-HWV   Doc 28-1   Filed 05/21/20   Entered 05/21/20 07:58:34   Desc
Main Document   Page 4 of 19



County of Huntingdon
Mapping Department
UPI Certifications
Date: 1/9/2018
Number of UPI's: 1
Initials: PHS

RECORDED
01/09/2018          01:37:19 PM
Virginia Cooper
Register and Recorder
Clerk of Orphans' Court
Huntingdon County, PA
Instrument: 2018-000114

Parcel Number: ███████

This Instrument Prepared By and
Return to:
**THE HUNTINGTON NATIONAL**
**BANK**
**P.O. Box 122620 - SW30**
**Covington, KY 41012-9956**
**Christina Davis**

~~Open-End Mortgage~~
~~Secured Personal Credit Line~~
**This Mortgage Secures Future Advances**

THIS OPEN-END MORTGAGE (this "Mortgage") is given by: **PATRICK M REEDER, AN UNMARRIED MAN** (the "Mortgagor", whether one or more), whose address is **17 W CHESTNUT ST, MOUNT UNION, PA 17066-1102 US**, to **THE HUNTINGTON NATIONAL BANK**, a national banking association (the "Mortgagee"), whose address is Department GW0214, 5555 Cleveland Avenue, Columbus, OH 43231.

WHEREAS, **PATRICK M REEDER** (the "Borrower", whether one or more) is/are entering into or has/have entered into a Personal Credit Line Agreement and Disclosure Statement-Secured (the "Agreement") with Mortgagee, dated **DECEMBER 15, 2017**, for a line of credit in an amount not to exceed **$195150.00** (the "Credit Limit"), which Agreement provides for Borrower to obtain loan advances thereunder from time to time during the draw period by use of certain access devices or other means (whether purchases or cash advances), and obligates Borrower to repay the loan advances according to certain payment requirements, including interest on the advances at a fixed or variable rate and other charges as set forth in the Agreement, with the unpaid balance due and payable on **DECEMBER 15, 2047**.

NOW, THEREFORE, IN CONSIDERATION of the Agreement and any and all indebtedness incurred thereunder and to secure to Mortgagee (a) the repayment of the indebtedness evidenced by the Agreement, or any one or more renewals, refinancings, modifications, extensions, replacements or substitutions thereof or of the terms thereof (including but not limited to any substitute or replacement credit line agreement or closed-end promissory note), including but not limited to loan advances made from time to time after this Mortgage is delivered to the County Recorder for record and regardless of whether the indebtedness secured hereby is paid in full and thereafter loan advances are made pursuant to the Agreement, and all interest and charges in connection therewith; (b) the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Mortgage, including but not limited to payment of taxes, assessments, and insurance premiums; and (c) the performance of the covenants and agreements of Borrower contained in this Mortgage and in the Agreement, Mortgagor does hereby mortgage,

PA DEED (PCL)

Page 1 of 6



Order Number : ████████████

Loan No. : ████████████

## EXHIBIT A
### Legal Description

ALL that certain lot or parcel of land situated in the first ward of the borough of Mount Union, Huntingdon County. Pennsylvania, bounded and described as follows:

SITUATED on the South side of West Chestnut Street one hundred and fifty (150) feet from the South East corner of Chestnut and Jefferson Streets; thence along the line of West Chestnut Street in an easterly direction fifty (50) feet to a point; thence in a Southerly direction perpendicular to said Chestnut Street a distance of one hundred and sixty (160) feet to Vine Street or Alley; thence in a Westerly direction along the line of said Vine Street to a point a distance of fifty (50) feet, thence in a Northerly direction perpendicular to Chestnut Street a distance of one hundred and sixty (160) feet to said Chestnut Street and place of beginning. Bounded on the North by West Chestnut Street; on the East by the lot now or formerly of Charles H. Fetterolf, on the South by West Vine Street and on the West by lot now or formerly of Abramson.

Being the same property as conveyed to PATRICK M. REEDER, UNMARRIED, by deed from MICHAEL M. KIPPHAN, MASTER IN PARTITION, dated 3/17/2010 and recorded 3/17/2010 in Book 973 Page 769, Huntingdon County records.

████████████████

PATRICK M REEDER
17 W CHESTNUT ST
Mount Union, PA 17066

EXHIBIT

grant, bargain, sell, and convey to Mortgagee, its successors and assigns, forever, the following described premises situated in **HUNTINGDON** County, Pennsylvania:

**SEE ATTACHED EXHIBIT A**

be the same more or less, subject to all legal highways, and together with all easements, privileges and appurtenances thereunto belonging, all estates in reversion or remainder, all rents, issues and profits arising therefrom and all improvements and fixtures of every kind, now or hereafter acquired, erected or attached to said premises (together with said premises, collectively, the "Property").

MORTGAGOR COVENANTS that Mortgagor has a good and marketable title in fee simple to the Property; that the same is free and clear from all encumbrances whatsoever except taxes and assessments payable hereafter and the balance presently due on a certain mortgage held of record by **N/A**, recorded in the Office of the County Recorder of **HUNTINGDON** County, Pennsylvania, mortgage records; and will warrant and defend the same with appurtenances unto Mortgagee, its successors and assigns, forever against all lawful claims and demands whatsoever, except as above noted.

MORTGAGOR FURTHER COVENANTS AND AGREES:

1. To pay the obligations secured hereby as evidenced by the Agreement (but only for any Mortgagor who is also a Borrower), and all taxes, assessments and utilities against the Property as the same shall become due and payable; and to pay when due all other indebtedness secured by a lien upon the Property, or any part thereof, to the extent Mortgagor is obligated under the instrument of indebtedness; and to pay and properly discharge, at Mortgagor's expense, the lien of any mechanic, laborer, materialman, supplier or vendor.

2. To keep and maintain all improvements on the Property at all times in good repair and not to commit or suffer to be committed waste upon the Property. If this Mortgage is on a unit in a condominium or a planned unit development, Mortgagor shall perform all of Mortgagor's obligations under the declaration or covenants creating and governing the condominium or planned unit development, the bylaws and regulations of the condominium or planned unit development, and all constituent documents.

3. To keep the improvements on the Property insured against loss or damage by fire, windstorm, flood, and such other hazards as Mortgagee requires for the benefit of Mortgagee and the holder of any prior mortgage encumbering the Property, in the aggregate amount of the total indebtedness secured by this Mortgage and any prior mortgage, with insurance companies acceptable to Mortgagee, and to deposit with Mortgagee the policies of insurance or copies or other evidence thereof acceptable to Mortgagee. Subject to the rights of the holder of any prior mortgage, Mortgagee is hereby authorized to adjust and compromise any loss covered by such insurance, to collect the proceeds thereof, indorse checks and drafts issued therefor in its own name and/or as attorney-in-fact for Mortgagor, and to apply such proceeds as a credit upon any part of the indebtedness secured hereby, whether then due or thereafter becoming due, or to permit the use of the same for the purpose of rebuilding or repairing the improvements. Mortgagor shall name Mortgagee as an additional insured or loss payee on all such policies, which policies shall contain a 10-day written notice of cancellation clause in favor of Mortgagee.

4. To perform all the covenants on the part of Mortgagor to be performed under the provisions of this Mortgage and any prior mortgage, and upon failure of Mortgagor to perform such covenants, Mortgagee may at its option do so. Mortgagee shall have a claim against Mortgagor for all sums so paid by it for Mortgagor plus interest as hereinafter provided; it being specifically understood that although Mortgagee

PA DEED (PCL)

Page 2 of 6

# PERSONAL CREDIT LINE
### Agreement and Disclosure Statement - Secured

██████████████

This agreement ("Agreement") states the terms of your Personal Credit Line account. As used in this Agreement, "you" and "your" mean each person who signs this Agreement as a customer. If there is more than one customer, each of you is responsible both individually and jointly for all the obligations under this Agreement. "We", "us" and "our" mean The Huntington National Bank, with its main office in Columbus, Ohio. "Credit Card" means any credit card we issue to access this account.

## GOVERNING LAW

All interest, fees and other amounts charged or accruing in connection with this Agreement which are considered "interest" within the meaning of Section 85 of the National Bank Act (12 USC § 85; 12 CFR 7.4001(a)) shall be governed by and interpreted under Ohio law. In all other respects, this Agreement shall be governed by and interpreted under federal law and, to the extent that federal law does not control, the law of the State where the real property securing this Agreement is located, without regard to principles of choice of law or conflict of law. If applicable law makes part of this Agreement void, the other terms will still be enforceable.

---

*Date Of This Agreement:* DECEMBER 15, 2017

*Credit Limit:* $195,150.00

*Draw Period:* Begins on the date of this Agreement or, if there is a rescission period, after the end of the rescission period. Ends on the last day of the monthly statement period 120 months after the date of this Agreement, unless ended earlier as provided in this Agreement.

*Repayment Period:* Begins at the end of the Draw Period. Ends on the payment due date for the 240TH monthly statement period after the end of the Draw Period.

*Maturity Date:* The payment due date for the 240TH monthly statement period in the Repayment Period.

*Margin For Primary Line Feature:* 1.620 percentage points

*Beginning Rate For Primary Line Feature:*

 ☒ If this box is checked, the beginning **ANNUAL PERCENTAGE RATE** and the daily periodic rate are based on the index described in Section 2.6(c) and the margin shown immediately above. These rates are not available until the next-to-last business day of the first monthly statement period. The current **ANNUAL PERCENTAGE RATE** for the Primary Line Feature is 6.120% (0.017% daily periodic rate).

 ☐ If this box is checked, the beginning **ANNUAL PERCENTAGE RATE** for the Primary Line Feature is 6.120% (0.017% daily periodic rate). This is an introductory rate that is not based on the index described in Section 2.6(c) and the margin shown immediately above, which are used to make later rate changes. If it had been, it would have been an **ANNUAL PERCENTAGE RATE** of 9.620% (0.026% daily periodic rate). This introductory rate will be in effect until the Rate Change Begin Month as set forth immediately below.

*Rate Change Begin Month:*  <u>01</u>   <u>2018</u>
         (month) (year)

*Minimum Rate For Primary Line Feature:* **ANNUAL PERCENTAGE RATE** of 2.960%

*Maximum Rate For Primary Line Feature or any Personal Selection Feature:* **ANNUAL PERCENTAGE RATE** of 18.000%

*Minimum Monthly Payment Election For Draw Period:*
☒ Interest Only
☐ Percentage of Principal Plus Interest

*Margin For Personal Selection Features:* 5.370 percentage points

*Annual Percentage Rate For Personal Selection Feature:* The annual percentage rate for a Personal Selection Feature will be determined at the time the feature is set up as provided in Section 1.1 and will be determined based on the index described in Section 2.7(b) and the Margin For Personal Selection Features set forth immediately above. A Personal Selection Feature set up on the date of this Agreement would have an **ANNUAL PERCENTAGE RATE** of 7.670% (0.021% daily periodic rate). The annual percentage rate at the time a Personal Selection Feature is set up may be more or less than this rate.

*Minimum Rate For Personal Selection Feature:* **ANNUAL PERCENTAGE RATE** of 5.490%

---

*Account Fees:* You agree to pay the following fees that are applicable to your account as indicated where we have checked the applicable box. These fees will be debited to your account when due:

☒ *Annual Fee:* $60.00
☒ *Over Line Fee:* Subject to the limit in Section 1.8(d), for any monthly statement period for which the total outstanding balance of your account exceeds your Credit Limit by more than 1.25% of the Credit Limit, determined as of the closing date of that monthly statement period: $30.00.
☒ *Late Fee:* For each minimum payment that we do not receive within 10 days after the due date for that payment: $30.00.
☒ *Returned Item Fee:* Each time you pay us with a check, money order, preauthorized charge or other item that is returned to us unpaid: $30.00.
☒ *Stop Payment Fee:* Each time you place a stop payment order on any Personal Credit Line Check you have written on your account: $30.00.
☒ *Personal Selection Feature Set-Up Fee:* For each Personal Selection Feature that you request and we agree to set up: $75.00. **FINANCE CHARGE**
☒ *Personal Selection Feature Conversion Fee:* For converting any Personal Selection Feature balance back to the Primary Line Feature balance: $100.00. **FINANCE CHARGE**

---

  19559.46

██████████████

☒ *Document Copy Fee:* $5.00 per page for copies of account documents (such as copies of statements or checks), except for documents in connection with a billing error dispute.

☒ *Research Fee:* $25.00 per hour for research you request in connection with your account, except for research in connection with a billing error dispute.

*Real Property Securing This Agreement:*

17 W CHESTNUT ST, MOUNT UNION, PA 17066-1102

*Other Property Securing This Agreement:*

_____

*Account Opening Charges:* The following finance and other charges will be debited to your account at the time of the opening of the account:

**FINANCE CHARGE** *Related to Account Opening:*

| | | | |
|---|---|---|---|
| TITLE - COURIER FEE | **FINANCE CHARGE** | $ | 25.00 |
| To:_____ | | | |
| TITLE - NOTARY FEE | **FINANCE CHARGE** | $ | 125.00 |
| To:_____ | | | |

*Real Property Fees Imposed by Third Parties:*

**NOTICE:** This Personal Credit Line Agreement is contained on 7 (seven) numbered pages. All of the provisions on all pages are a part of this Agreement.

**Acknowledgment**

By signing this Agreement, each of you is telling us:

- That each of you has received a copy of all of the pages of this Agreement.
- That each of you has read the entire Agreement.
- That we have given each of you the chance to ask any questions you may have about this Agreement.
- That each of you agrees to comply with all of the terms and conditions of this Agreement.
- That our employees or agents have not told you anything that disagrees with the terms of this written Agreement.
- That you received a copy of our Customer Information Privacy Notice.

_____  12/15/17
- BORROWER - PATRICK M REEDER - DATE -

19559.46

## 1. SETTING UP YOUR ACCOUNT AND GETTING FUNDS

### 1.1 Multiple Features.

**(a)** **Account Structure.** Your Personal Credit Line account consists of a primary credit line portion (the "Primary Line Feature") and as many optional subaccounts that you request and we agree to set up (each being a "Personal Selection Feature"). All advances and purchases for your account will be posted to the Primary Line Feature. The total outstanding balance of your account includes all balances in the Primary Line Feature and all Personal Selection Features. We may decide not to set up any Personal Selection Feature(s) you request, and we may from time to time suspend the offering of Personal Selection Features.

**(b)** **Types Of Personal Selection Features.** We offer two types of Personal Selection Features: (i) a Fixed-Payment Personal Selection Feature, and (ii) an Interest-Only Personal Selection Feature.

**(c)** **Fixed-Payment Personal Selection Features.** For balances in a Fixed-Payment Personal Selection Feature, we provide a fixed monthly payment amount payable over a term that you choose and a fixed annual percentage rate. You may choose any of the following number of months for the term of a Fixed-Payment Personal Selection Feature: 12, 24, 36, 48, 60, 72, 84, 96, 108, 120, 180 or 240. Fixed-Payment Personal Selection Features can only be set up prior to three (3) months before the end of the Draw Period.

**(d)** **Interest-Only Personal Selection Features.** For balances in an Interest-Only Personal Selection Feature, we provide a fixed annual percentage rate over a time period that you choose and an interest-only payment amount. You may choose any of the following number of months as the time period for which the fixed annual percentage rate will apply: 12, 36, 60 or 84. We call this the "Fixed-Rate Period," but the selected period for the fixed annual percentage rate is only available if it ends before the end of the Draw Period. Once the Fixed-Rate Period ends, the Interest-Only Personal Selection Feature will continue until the earlier of payoff of the balance in that Interest-Only Personal Selection Feature or the end of the Draw Period. After the Fixed-Rate Period ends, the annual percentage rate for the Interest-Only Personal Selection Feature will be a variable rate. If there is still a balance in the Interest-Only Personal Selection Feature at or near the end of the Draw Period (as we determine), we will transfer that balance to the Primary Line Feature at that time.

**(e)** **Set Up Of Personal Selection Features.** In order for us to set up a Personal Selection Feature, you must request us to do so, tell us which type of Personal Selection Feature you are requesting, and sign any documents we require in connection with setting it up. Once that is done and we approve setting up the Personal Selection Feature, we will transfer the amount identified in your request from the Primary Line Feature to the Personal Selection Feature. This amount may represent advances or purchases or both from the Primary Line Feature, as we determine. The minimum amount to set up a Personal Selection Feature is $2,500.00. Only one amount may be transferred to any one Personal Selection Feature. Additional amounts may not be added to a Personal Selection Feature. We will charge a Personal Selection Feature set-up fee as shown on the first page of this Agreement for each Personal Selection Feature that we set up.

**(f)** **Converting Personal Selection Feature Balances To Primary Line Feature.** At your request, subject to our approval, we will terminate a Personal Selection Feature and transfer the balance in that Personal Selection Feature to the Primary Line Feature. You agree to sign any documents we require in connection with the conversion. We will charge a Personal Selection Feature conversion fee as shown on the first page of this Agreement for each Personal Selection Feature that we terminate at your request. This conversion fee does not apply to any balance we transfer from an Interest-Only Personal Selection Feature to the Primary Line Feature pursuant to Section 1.1(d).

### 1.2 Draw Period and Repayment Period.

**(a)** **Term Of Draw Period.** The "Draw Period" is the period of time that you will be able to use this account to obtain advances or make purchases. The length of the Draw Period for your account is shown on the first page of this Agreement.

**(b)** **Beginning Of Draw Period.** The Draw Period begins on the date of this Agreement shown on the first page of this Agreement. However, if there is a rescission period required by applicable law starting on the date of this Agreement, the Draw Period begins at the end of that rescission period.

**(c)** **Draw Period Not Extended.** The length of the Draw Period is not extended or otherwise affected by any of the following:

- Any period of time during which your Credit Limit is suspended or reduced by you or by us.
- The establishment of any Personal Selection Feature.

**(d)** **End Of Draw Period.** After the end of the Draw Period, you will no longer be able to use this account to obtain advances or make purchases. At the end of the Draw Period, you must destroy (or give us back if we ask you to) any access devices (such as checks or credit cards) we gave you for this account.

**(e)** **Repayment Period.** The scheduled length of the Repayment Period is shown on the first page of this Agreement, and begins at the end of the Draw Period. You must pay off the total outstanding balance of your account during the Repayment Period.

### 1.3 Advances and Purchases.

**(a)** **Our Agreement.** We agree to loan you funds during the Draw Period to the full amount of your Credit Limit, less any finance charges or other charges that we include in the total outstanding balance of your account. We agree to do this either by making advances to you or by paying for purchases that you make from merchants who honor your Credit Card issued for this account. Our agreement to make these advances to you or allow you to make purchases is subject to all of the terms of this Agreement.

**(b)** **Advances.** Subject to all of the terms of this Agreement, you can use your account to obtain advances in any of the following ways:

- By writing Personal Credit Line Checks.
- By using your Credit Card issued for this account to obtain cash advances from any of our offices or other financial institutions that honor your Credit Card or from any automated teller machine that accepts your Credit Card.
- By directing us to pay-off existing loan(s) and transfer the balance(s) to this account.
- By using your account to make transfers to other deposit accounts you may have with us though our online service.
- By any other access device or other means of access which we authorize or allow.

We may from time to time post debits to your account as advances.

**(c)** **Purchases.** Subject to all of the terms of this Agreement, you can use your Credit Card issued with this account to purchase goods and services from merchants who honor your Credit Card. We may from time to time post debits to your account as purchases.

**(d)** **Multiple Account Owners.** Any one of you may individually use your Personal Credit Line Checks, Credit Card, or any other access device or other means we authorize or allow to obtain advances or make purchases. We are not able to honor any request to require more than one of you to sign Personal Credit Line Checks or otherwise authorize an advance or purchase.

**(e)** **Refusal To Accept.** We will not be liable to you or anyone else if anyone refuses to accept your Personal Credit Line Checks or Credit Card or any other access device or means of access. If any automated teller machine runs out of cash or receipts, or does not work properly, we are not liable, except for any billing error.

**(f)** **Limitations.** Financial institutions (including us) or merchants that honor credit cards or that operate automated teller machines ("ATM") may have limits on the number or dollar amount of transactions during any period of time. These limits may apply when you use your Credit Card at these financial institutions or merchants. Any advance requested in cash at an ATM or otherwise is subject to availability of cash at the facility at which the advance is requested.

**(g)** **Fees Charged By Others.** If you use your Credit Card to obtain advances at an ATM that is not ours, you may be charged a fee by the ATM operator or any network used. In addition, you may be charged fees by other third parties for use of your Credit Card or other access device or means of access, such as (i) for purchases at stores or merchants, and (ii) for obtaining advances at banks, financial institutions or other businesses that honor your Credit Card.

**(h)** **Payments On This Account.** You are not permitted to use Personal Credit Line Checks, your Credit Card or any other access device or means of access to make payments due on this account.

### 1.4 Personal Credit Line Checks.

**(a)** **Prohibition.** You are not permitted to write postdated Personal Credit Line Checks.

**(b)** **Cash Advances.** All Personal Credit Line Checks you write are cash advances, even if you write one to a merchant or anyone else to purchase goods or services.

### 1.5 Credit Card.

We may issue a Credit Card for this account at our discretion, but we are not required to do so. If we do not issue any Credit Card for this account, the references in this Agreement to "Credit Card" are of no effect. If we do issue a Credit Card for this account, it is solely as an optional access device that we may terminate at any time and for any reason without otherwise affecting this Agreement or your ability to obtain advances by other means.

### 1.6 Transferred Balances.

If we open this account for you in order to replace an existing account, you authorize us to transfer the balances and any trailing activity on the existing account to this account.

### 1.7 Promise To Pay.

You promise to pay for all advances, purchases, finance charges, other charges and any other balances on your account when due in accordance with the terms of this Agreement. You agree to this if the funds are obtained or the charges are incurred by you or any other person that you authorize. You agree to this even if the person you authorize exceeds your authority. If you authorize another person to use your Credit Card or Personal Credit Line Checks or any other access device or means of access and you want to terminate that person's authority, you must recover the Credit Card, Personal Credit Line Checks or other access device from that person or otherwise terminate that person's means of access.

### 1.8 Credit Limit

**(a)** **Amount.** We show the amount of your Credit Limit on the first page of this Agreement. We may also show it on your monthly statements. You agree not to let the total outstanding balance of your account go over your Credit Limit.

**(b)** **Account Balance.** The total outstanding balance of your account is the sum of:

- The amount or portion of all advances and purchases you have not repaid.
- Any unpaid finance charges on your account.
- Any unpaid other charges on your account.
- Any other amounts due on your account.

**(c)** **Over Credit Limit.** We do not have to permit any advance or pay for any purchase if it would cause the total outstanding balance of your account to go over your Credit Limit. If we allow the advance or purchase anyway, or if finance charges or fees put you over the Credit Limit, you must pay the amounts over the Credit Limit and any related finance charges and other charges at the time your next payment is due. See also Section 3.1(a).

**(d)** **Limit On Over Line Fee.** We will not charge the Over Line fee for more than three (3) consecutive monthly statement periods. Once that limit is reached, we will not charge the Over Line fee again until the total outstanding balance of your account has been reduced below the amount that triggers the Over Line fee for at least one (1) monthly statement period.

**(e)** **Increases.** If you want to increase your Credit Limit, all of you must sign the documents we require. Any increase is subject to our product availability, underwriting criteria, and other conditions we require.

## 2. FINANCE CHARGE AND ANNUAL PERCENTAGE RATE

### 2.1 Finance Charge Not Determined By Periodic Rate.

**(a)** **Finance Charge Related To Your Account.** You agree to pay any finance charge related to your account, whether due at account opening, that is shown on the first page of this Agreement or otherwise due under this Agreement.

**(b)** **Not In Annual Percentage Rate.** Any finance charge not determined by the periodic rate will not be reflected in the annual percentage rate or rates applicable under this Agreement.

### 2.2 Finance Charge Determined By Periodic Rate.

**(a)** **When Rate Begins.** We charge a finance charge on each advance and purchase by applying a daily periodic rate. For advances, this finance charge begins on the date we make the advance. However, for any Personal Credit Line Check it begins on the date we pay the check. For purchases, the finance charge begins on the date the transaction is posted to your account. There is no grace period.

**(b)** **Rate We Charge.** For each monthly statement period, we figure this

19559.46

finance charge separately for each of the following categories:

- Advances in the Primary Line Feature.
- Purchases in the Primary Line Feature.
- Balances (whether purchases or advances) in each Personal Selection Feature.

For each monthly statement period, we will multiply a daily periodic rate times the average daily balance for each category times the number of days in the monthly statement period. The daily periodic rate for each category is 1/365th (1/366th for any leap year) of the **ANNUAL PERCENTAGE RATE** in effect for the monthly statement period for each category. We will round the daily periodic rate in the manner and to the number of decimal places that we determine.

### 2.3 Average Daily Balance.

(a) **Ending Daily Balance.** To calculate the average daily balance, we first determine the ending daily balance each day. We do this separately for each category identified in Section 2.2(b). To do this:

- We start with the ending daily balance of each category from the previous day (on the first day of this account for the Primary Line Feature, and on the first day of any Personal Selection Feature, that amount is $0).
- We then add to each balance, as applicable, the new day's advances and purchases.
- We then subtract from each balance, as applicable, the new day's payments and credits which are applied to such balance.

(b) **Averaging Method.** We then add together the ending daily balances for each day in the monthly statement period (any credit balance is treated as zero for purposes of calculating the daily balances). We do this separately for each category identified in Section 2.2(b). We then divide the total for each category by the number of days in that monthly statement period. This gives us the average daily balance for each category.

### 2.4 Annual Percentage Rate.
The annual percentage rate or rates disclosed or used in this Agreement do not include costs other than interest.

### 2.5 Maximum and Minimum Annual Percentage Rate.
(a) **Maximum Rate.** The maximum rate for balances in the Primary Line Feature or any Personal Selection Feature is shown on the first page of this Agreement as the "Maximum Rate For Primary Line Feature or any Personal Section Feature." However, we will not permit the annual percentage rate to be, or increase to, a rate higher than permitted by applicable law.

(b) **Minimum Rate.** The minimum rates for balances in the Primary Line Feature or any Personal Selection Feature are shown on the first page of this Agreement as the "Minimum Rate For Primary Line Feature" and the "Minimum Rate For Personal Section Feature." However, these minimum rates do not apply to the **ANNUAL PERCENTAGE RATE** shown on the first page of this Agreement as the "Beginning Rate For Primary Line Feature" if that rate is lower than the minimum rate.

### 2.6 Annual Percentage Rate For Primary Line Feature.
(a) **Beginning Annual Percentage Rate For Primary Line Feature.** The annual percentage rate for the Primary Line Feature is a variable rate. The beginning annual percentage rate for the Primary Line Feature is shown on the first page of this Agreement as the "Beginning Rate for Primary Line Feature." This rate will apply until rate changes begin.

(b) **Index And Margin.** We determine the annual percentage rate for the Primary Line Feature by using an index. To change the rate, we determine the value of that index at certain times and add a certain number of percentage points to it. The number of percentage points we add to the index is called the "margin".

(c) **What Index We Use.** The index that we use for the Primary Line Feature is the "Bank Prime Loan" rate published by the Board of Governors of the Federal Reserve System in its statistical release H.15 entitled "Selected Interest Rates". If more than one rate is shown for the "Bank Prime Loan" rate, we use the average of the rates that are shown.

(d) **What Margin We Use.** The margin for the Primary Line Feature is shown on the first page of this Agreement as the "Margin For Primary Line Feature."

(e) **When We Change The Annual Percentage Rate.** The annual percentage rate for the Primary Line Feature may change as often as monthly. Any change in the rate is effective on the first day of any monthly statement period and is effective for that entire monthly statement period. The first rate change applicable to the Primary Line Feature on your account will be for the monthly statement period that ends in the month shown as the "Rate Change Begin Month" on the first page of this Agreement.

(f) **How We Determine Annual Percentage Rate Changes.** We determine the annual percentage rate effective for each monthly statement period for the Primary Line Feature by determining the value of the index as of the next-to-last business day of that monthly statement period. A "business day" for this purpose is any calendar day except a Saturday, a Sunday or a federal legal public holiday. We then add to that index value the margin for the Primary Line Feature. This gives us the annual percentage rate applicable to the Primary Line Feature for that statement period.

(g) **Annual Percentage Rate Applicable For Draw Period And Repayment Period.** The annual percentage rate for the Primary Line Feature is determined as described above for each monthly statement period in the Draw Period and in the Repayment Period.

(h) **Effect Of Annual Percentage Rate Increases.** Any increase in the annual percentage rate for the Primary Line Feature will increase the amount of finance charge due and will thus increase the minimum monthly payment amount due for the Primary Line Feature.

### 2.7 Annual Percentage Rate For Personal Selection Features.
(a) **Annual Percentage Rate.** The annual percentage rate for any Personal Selection Feature is determined by the index and margin as described in this Section 2.7. Different Personal Selection Features may have different rates.

(b) **What Index We Use.** The index we use to determine the annual percentage rate for any Personal Selection Feature is based on the term of that Personal Selection Feature. For this purpose, the term is as follows:

(i) For a Fixed-Payment Personal Selection Feature it is the term we use to establish the monthly payment amount for that Personal Selection Feature pursuant to Section 1.1(c).

(ii) For an Interest-Only Personal Selection Feature it is the Fixed-Rate Period for that Personal Selection Feature as we determine pursuant to Section 1.1(d).

The index is the rate shown in the month column for interest rate swaps published by the Board of Governors of the Federal Reserve System in its statistical release H.15 entitled "Selected Interest Rates." The rate applicable to a particular Personal Selection Feature is the rate that corresponds to the term shown below:

| Term of Personal Selection Feature | Use rate for |
|---|---|
| Up to 36 months | 3-year interest rate swaps |
| Greater than 36 months up to 60 months | 5-year interest rate swaps |
| Greater than 60 months up to 120 months | 7-year interest rate swaps |
| Greater than 120 months | 10-year interest rate swaps |

We use the applicable rate as published in the most recently available "Selected Interest Rates" as of the time we act on your request to establish a Personal Selection Feature.

(c) **What Margin We Use.** The margin for any Personal Selection Feature which you request after you open your account is shown on the first page of this Agreement as the "Margin For Personal Selection Features."

(d) **How We Determine The Annual Percentage Rate.** To determine the annual percentage rate for a Personal Selection Feature you request after you open your account, we first determine the index value as indicated in Section 2.7(b). We then add to that index value the margin as determined in Section 2.7(c). The resulting sum is the annual percentage rate for that Personal Selection Feature.

(e) **Fixed-Payment Personal Selection Features.** Once the annual percentage rate is determined for a particular Fixed-Payment Personal Selection Feature, it will not change (except as provided in Section 2.8). The rate will be applicable for as long as there is any balance in that Fixed-Payment Personal Selection Feature.

(f) **Fixed-Rate Period For Interest-Only Personal Selection Features.** Once the annual percentage rate is determined for a particular Interest-Only Personal Selection Feature, it will not change (except as provided in Section 2.8) during the Fixed-Rate Period applicable to that Interest-Only Personal Selection Feature (see Section 1.1(d)). The Fixed-Rate Period begins on the day the Interest-Only Personal Selection Feature is set up and continues through the end of the monthly statement period in which the number of months in the Fixed-Rate Period ends. For example, the duration of a 12-month Fixed-Rate Period will be the remaining number of days in the monthly statement period in which the Interest-Only Personal Selection Feature was set up plus the 12 following monthly statement periods.

(g) **After Fixed-Rate Period For Interest-Only Personal Selection Features.** Beginning with the first monthly statement period after the end of the Fixed-Rate Period for any Interest-Only Personal Selection Feature that still has a balance at that time, the annual percentage rate for that Interest-Only Personal Selection Feature for each monthly statement period will be the same annual percentage rate that is applicable to the Primary Line Feature for that same statement period.

(h) **Effect Of Annual Percentage Rate Increases After Fixed-Rate Period.** Any increase in the annual percentage rate for an Interest-Only Personal Selection Feature for monthly statement periods after the end of the Fixed-Rate Period will increase the amount of finance charge due and will thus increase the minimum monthly payment amount due for that Interest-Only Personal Selection Feature.

### 2.8 Making Payments By Automatic Funds Transfer.
(a) **Set Up Of Automatic Funds Transfer.** You may have your monthly payments for this account made by automatic funds transfer from a checking account with us by completing our automatic funds transfer form. You may also set up automatic payments for this account through features we provide for your checking account, such as recurring payments through our online or telephone bill payment service.

## 3. PAYMENTS

### 3.1 Minimum Monthly Payment.
(a) **Amount.** You must make a minimum payment for each monthly statement period during the Draw Period and the Repayment Period until the Maturity Date. The payment due dates for the minimum monthly payments will be shown on the monthly billing statements. The minimum monthly payment due is the amount shown on the monthly billing statements. We compute this amount as the sum of:

- The minimum monthly payment amount due for the Primary Line Feature for that monthly statement period as determined in Section 3.2.
- The minimum monthly payment amount due for each Personal Selection Feature for that monthly statement period as determined in Section 3.3.

The following amounts must also be paid:

- Any other fees or charges due.
- The amount of the total outstanding balance of your account which is over your Credit Limit as of the statement date.
- Any amounts we consider past due on your account.

(b) **Prepayments.** You may pay more than your minimum monthly payment or pay us in full at any time. Partial prepayments will not affect your obligation to make minimum monthly payments when due.

(c) **Application Of Payments.** We will apply all payments we receive to advances, purchases, finance charges, and other fees and charges, whether in the Primary Line Feature or in any Personal Selection Feature, in the order we determine.

### 3.2 Minimum Monthly Payment Amount For Primary Line Feature.
(a) **Monthly Payment for Statement Periods During Draw Period.** We determine the minimum monthly payment amount for the Primary Line Feature for each monthly statement period during the Draw Period by either of the following methods that you select as indicated on the first page of this Agreement:

- Interest Only: The amount of periodic rate finance charges due for the Primary Line Feature for that monthly statement period.

19559.46

- Percentage of Principal Plus Interest: 0.42% of the outstanding principal balance in the Primary Line Feature as of the end of that monthly statement period, plus the amount of periodic rate finance charges due for the Primary Line Feature for that monthly statement period.

You may only change the above method that you selected for us to determine the minimum monthly payment if you and we agree in writing to the change.

(b) **Effect of Paying Only The Interest Only Minimum Amount During Draw Period.** If you choose the Interest Only method of determining the minimum monthly payment amount and pay only that amount, you will not reduce the outstanding balance of advances and purchases in the Primary Line Feature during the Draw Period.

(c) **Monthly Payment For Statement Periods During Repayment Period.** The minimum monthly payment amount for the Primary Line Feature for each monthly statement period during the Repayment Period is the greater of (i) 0.42% of the outstanding principal balance in the Primary Line Feature at the beginning of the Repayment Period, plus the amount of periodic rate finance charges due for the Primary Line Feature for that monthly statement period, or (ii) $100. However, if the sum of the periodic finance charges due and the outstanding principal balance is less than $100, the minimum monthly payment will be the amount of that sum. The outstanding principal balance will include the principal balance of any Interest-Only Personal Selection Feature we transfer to the Primary Line Feature at or near the end of the Draw Period.

**3.3 Minimum Monthly Payment Amount For Personal Selection Features.**

(a) **Minimum Monthly Payment For Fixed-Payment Personal Selection Features.** The minimum monthly payment amount for each Fixed-Payment Personal Selection Feature for each monthly statement period, whether during the Draw Period or the Repayment Period, is the amount we compute is necessary to repay the initial balance of that Fixed-Payment Personal Selection Feature in substantially equal payments over the applicable term of that Fixed-Payment Personal Selection Feature at the fixed annual percentage rate applicable to that Fixed-Payment Personal Selection Feature.

(b) **Minimum Monthly Payment For Interest-Only Personal Selection Features.** The minimum monthly payment amount for each Interest-Only Personal Selection Feature for each monthly statement period is the amount of periodic rate finance charge due for that Interest-Only Personal Selection Feature for that monthly statement period.

(c) **Effect Of Paying Only The Minimum Amount For Interest-Only Personal Selection Features.** If you pay only the minimum monthly payment amount for each month for an Interest-Only Personal Selection Feature, you will not reduce the outstanding balance in that Interest-Only Personal Selection Feature.

**3.4 Your Maturity Date Obligations.**

(a) **Maturity Date.** The Maturity Date is shown on the first page of this Agreement. If you pay at least the minimum monthly payment each month, you will fully repay advances and purchases on your account by or before the Maturity Date.

(b) **Maturity Date Payment.** On the Maturity Date, if the total outstanding balance of this account is more than the minimum monthly payment due (because, for example, you have not paid at least the minimum monthly payment each month when due, or have incurred other charges or fees on your account that have not been paid), you must pay the total outstanding balance of your account.

## 4. SECURITY FOR THIS ACCOUNT

**4.1 Real Property.**

At the time you sign this Agreement, you are also signing an open-end mortgage, deed of trust, deed to secure debt, security deed, or similar security instrument ("Security Instrument") as security for this Agreement.

**4.2 Other Security.**

You give us a security interest in the property identified as "Other Property Securing This Agreement" on the first page of this Agreement. This property secures all of your obligations under this Agreement. You agree to sign and give us the documents we require to evidence and perfect that security interest. If you live in Indiana or any property securing this account is located in Indiana, you waive all relief from valuation and appraisement laws.

**4.3 Our Waiver.**

We agree that except for the security mentioned in this Agreement, any other mortgage, deed of trust, deed to secure debt or security interest which secures any other present or future loan from us does not secure this account.

**4.4 Property Insurance.**

You must buy and keep in force the property insurance that we require on the real property securing this account. This includes flood insurance if the property is in a flood hazard area. The amount of this insurance must be enough to pay the full amount secured by previously existing encumbrances, mortgages, deeds of trust, or liens on the property and the full amount of your Credit Limit under this Agreement. However, you are not required to have insurance in an amount greater than the replacement cost of the improvements on the real property securing this account. You agree that your insurer will include us as an additional insured or loss payee, as we require. You may obtain insurance from any insurer of your choice that is qualified and properly licensed to offer such insurance covering the real property securing this account and is financially acceptable to us. Your choice of an insurance company to provide the insurance coverage required under this Agreement will not affect our decision regarding the extension of credit to you. If you obtain insurance through us or an affiliate of ours, we or our affiliate may earn a commission or other benefit.

**4.5 Use of Real Property.**

If you use the real property securing this account as your personal residence, you agree that you will continue to do so until both of the following occur:

- There is no longer any outstanding balance on your account; and
- Your account has been permanently terminated or cancelled or the Draw Period has come to an end.

**4.6 Failure To Pay Taxes, Insurance Premiums, Other Amounts.**

If you fail to pay any real estate taxes or property insurance premiums on the real property securing this account, you agree that we may (if we choose) do so ourselves. We may also advance other amounts (if we choose) to protect our security in the real property securing this account. If we pay or advance these amounts, you must reimburse us, with interest at the applicable annual percentage rate for the Primary Line Feature under this Agreement. If you do

not reimburse us within ten (10) days after we send you written notice of the amount advanced plus interest, you authorize us to add such amounts to the balance in the account as an advance.

## 5. DEFAULT, TERMINATION, SUSPENSION AND CANCELLATION

**5.1 Our Rights.**

Our rights to terminate and/or accelerate your account or to suspend or reduce your Credit Limit are as set forth in this Agreement. We have any other rights applicable law gives us.

**5.2 Notice And Right To Cure Default.**

If any of the events listed in Section 5.3 occurs, you will be in default. If you are in default and the real property securing this Agreement is located in, or you live in, a state where the law requires lenders to give a notice of default and gives borrowers the right to cure or correct the default, we will comply with such requirements unless preempted by applicable federal law.

**5.3 Our Rights To Terminate And Accelerate Your Account.**

(a) **Termination.** We have the right to terminate your account and end the Draw Period early if any of the following events occurs:

- If you commit fraud or make a material misrepresentation at any time in connection with this account.
- If you fail to meet the repayment terms of this Agreement for any outstanding balance.
- If any action or inaction by you adversely affects the property securing this account, or any of our rights in such property, including, without limitation:
  - If you transfer title to the property or sell the property without our permission.
  - If you fail to maintain required insurance on the property.
  - If you fail to pay taxes on the property.
  - If you permit the filing of a lien senior to ours on the property.
  - All of the customers obligated on the account die.
  - If the property is taken through eminent domain.
  - If a prior lienholder forecloses on the property.

These events are called "Termination Events of Default." Termination of your account and ending the Draw Period early means that you will be permanently unable to use this account to obtain advances or make purchases. Termination is effective immediately. Unless we also exercise our right to accelerate the balance due, the Repayment Period will begin for the monthly statement period following the monthly statement period in which we terminate your account.

(b) **Acceleration.** We also have the right to require you to pay the total outstanding balance in a single payment if a Termination Event of Default occurs, whether during the Draw Period or the Repayment Period. This is our "acceleration" right. If we terminate your account and do not accelerate the balance at the time of termination, we have the right to accelerate the balance later if the Termination Event of Default still exists at that time.

(c) **Other Action.** If any Termination Event of Default occurs, we may take action short of termination or acceleration (such as suspending or reducing your Credit Limit or ending the Draw Period early), or take no action at all or for a period of time. This will not affect our right to terminate or accelerate at a later time as long as the Termination Event of Default still exists at that time.

(d) **Other Rights.** If we terminate and accelerate your account, we may exercise other rights. These include bringing suit for collection of amounts owed or foreclosing against the property securing this account. We have any other remedies not prohibited by applicable law. All of our remedies are cumulative and not exclusive. We may exercise them at the same time or at different times.

(e) **Transfer of Property.** If all or any part of the property or any interest in the property is sold or transferred (or if you are not a natural person and a beneficial interest in you is sold or transferred) without our prior written consent, we may require immediate payment in full of all sums secured by the Security Instrument. However, we shall not exercise this option if such exercise is prohibited by Applicable Law.

**5.4 Our Rights To Suspend Or Reduce Your Credit Limit.**

(a) **Suspension Or Reduction.** We have the right to suspend or reduce your Credit Limit if any of the events listed in this Section 5.4 occurs. These events are called "Suspension Events of Default." Suspension of your Credit Limit means that you will not be able to use this account to obtain advances or make purchases during the period of suspension. Each of the following is a Suspension Event of Default:

- If the value of the real property securing this account declines significantly below the property's appraised value for purposes of this account.
- If we reasonably believe that you will be unable to fulfill the repayment obligations under this account because of a material change in your financial circumstances.
- If you are in default of any material obligation under this Agreement, including, without limitation, if you no longer use the real property securing this Agreement as your personal residence (as provided in Section 4.5), if you permit an intervening lien to be filed that would take priority over future advances made by us under this Agreement, if you do not provide a security interest in the real property and other property that is to secure this account (as provided in Sections 4.1 and 4.2), if you exceed your Credit Limit (as provided in Section 1.8), if you do not pay all amounts owed under this Agreement (as provided in Sections 1.7, 3.1, 3.2, 3.3 and 3.4); or if you do not cooperate with us in updating your account information (as provided in Sections 6.5 and 6.9).
- If we are precluded by government action from imposing the annual percentage rate or rates provided for in this Agreement.
- If the priority of our security interest in the real property securing this account is adversely affected by government action to the extent that the value of that security interest is less than 120% of your Credit Limit.
- If we are notified by a regulatory agency that continued advances or purchases on your account is an unsafe or unsound practice.
- If the maximum annual percentage rate is reached.

(b) **Our Notice.** If we suspend or reduce your Credit Limit pursuant to Section 5.4(a), we will mail or deliver written notice of such action to each of you within three (3) business days after we take the action. The notice will tell

19559.46

you the specific reason(s) for our action.

**(c) Your Notice.** If a Suspension Event of Default ceases to exist, you must notify us before we are required to take any further action to remove the suspension or reinstate your Credit Limit. Your notice must be in writing. You must send your notice to The Huntington National Bank, Personal Credit Line Department, NC1N10, P. O. Box 1558, Columbus, Ohio 43216. Your notice must tell us why you think your Credit Limit should be reinstated. All of you must sign your notice. We have the right, but are not required, to waive any defects in your notice. When we receive your notice, we will investigate and determine whether your Credit Limit or some portion of it should be reinstated. We are not required to remove the suspension or reinstate your Credit Limit amount:

- If a Termination Event of Default has occurred and is continuing or if we terminated your account and ended the Draw Period as a result of a Termination Event of Default.
- During any period during which a Suspension Event of Default exists.
- If we canceled your account and ended the Draw Period early at your request.
- If removing the suspension or reinstating a prior Credit Limit would impair the security for this account, because, for example, an intervening lien from another creditor may have priority over our mortgage, deed of trust or other security interest securing this account.

You must pay us any reasonable appraisal and credit report fees we incur in connection with our investigation of your request for removal of a suspension or reinstatement of your Credit Limit.

**(d) Further Request.** If we decide not to reinstate your Credit Limit after receiving your notice, you have to send us another notice if you want us to reconsider or if you later want us to reinstate your account. We have no further duty to investigate if you give us the same reasons and there is no material change in the underlying facts.

**5.5 Cancellation Or Suspension By You.**

**(a) Cancellation.** If you want to cancel your account, you must notify us in writing that you are canceling your account. Cancellation will be effective when we receive your written notice and have had a reasonable time to act on it. A canceled account cannot have the Draw Period reinstated, but you may apply for a new account.

**(b) Effect Of Cancellation.** Cancellation means that you have ended the Draw Period early, and you will be permanently unable to use this account to obtain advances or make purchases. We do not have to refund any part of the Annual Fee or any other fee if you cancel. You must immediately stop using your Personal Credit Line Checks, Credit Card, and any other access devices or means of access we have given you to use for this account. You must promptly return them to us if we ask you to do so. You will still be liable for any continued use of your account after you cancel, including repayment of any advances or purchases and any related finance charges and other fees. If you cancel your account, the Repayment Period will begin for the monthly statement period following the monthly statement period in which your cancellation is effective.

**(c) Suspension Or Reduction Of Credit Limit By You.** If you want to suspend or reduce your Credit Limit without ending the Draw Period early, you may do so by notifying us in writing. Suspension means that you will not be able to use this account to obtain advances or make purchases during the period of suspension. If you want to reduce your Credit Limit, you must tell us in your notice what amount you want your Credit Limit reduced to. Suspension or reduction will be effective when we receive your written notice and have had a reasonable time to act on it. If you want us to remove a suspension that you requested or reinstate a Credit Limit that you asked to be reduced, you must ask us in writing in accordance with the procedures and other provisions of Section 5.4(c).

**(d) How To Give Notice.** Your written notice of cancellation or request to suspend your account or reduce your Credit Limit must be mailed to the address set forth in Section 5.4(c). We may require you to use our form of notice. We may waive any defects in your notice, but we are not required to. If more than one of you has signed this Agreement, any one of you may cancel or request to suspend your account or reduce your Credit Limit. We are not required to notify the others.

**5.6 Your Obligations When Draw Period Ends.**

**(a) Your Obligations.** If the Draw Period ends early because we terminate your account for default or you cancel your account, all of our rights and your obligations under this Agreement continue until there is no longer any outstanding balance.

**(b) Access Devices.** You must immediately stop using and destroy your Personal Credit Line Checks, Credit Card, and any other access devices or means of access we have given you to use for this account. You must promptly return any access devices to us if we ask you to do so.

**(c) Advances And Purchases.** We don't have to pay any Personal Credit Line Checks, make any advances, or accept any purchases. If we do, you will still have to repay those advances and purchases. You will also be liable for any related finance charges and other fees.

**5.7 Attorney Fees And Costs.**

If you default, you will have to pay the following costs and expenses we incur:

- Our reasonable attorney fees if we hire an attorney who is not our employee.
- Court costs as awarded by a court.
- Reasonable costs and expenses of taking possession of, holding, preparing for sale and selling any collateral for this account.

However, we will not require you to pay any amounts prohibited by applicable law.

**6. GENERAL PROVISIONS**

**6.1 Transactions In Foreign Countries.**

If you use your account to get an advance or make a purchase in a foreign country, the transaction may be in foreign currency. If the transaction is in a foreign currency, we will post the transaction to your account in U.S. Dollars based on the currency exchange rate on the day we settle the transaction. The currency exchange rate may be different on that day than on the day you used your account. Also, there may be special currency exchange charges, adjustment factors, surcharges or other charges that others charge, and this may increase the amount of the transaction. All of this may result in your account being posted for a greater or lesser amount than the original amount of the transaction.

19559.46

**6.2 Tax Implications.**

You should consult a tax advisor regarding the deductibility of interest and fees under this account.

**6.3 Unauthorized Use.**

You agree not to allow any unauthorized person to use this account.

**6.4 Lost Or Stolen Access Devices.**

**(a) Notification.** You agree to notify us immediately if any access device or means of access for your account is lost or stolen or used by someone without your authority or in excess of your authority.

**(b) Credit Card.** You may be liable for unauthorized use of your Credit Card. You will not be liable for unauthorized use of your Credit Card that occurs after you notify us of the loss, theft, or possible unauthorized use. In any case, your liability for unauthorized use of your Credit Card will not exceed $50.00.

**(c) Where To Notify Us.** Notify us by calling the following toll free number: 1-800-525-5678. If you also want to notify us in writing, you must do so at The Huntington National Bank, Credit Card Security, P.O. Box 1558, Columbus, Ohio 43216, but calling is the best way to limit your liability.

**6.5 Notices To Us About Changes That Affect You.**

You agree to notify us promptly if any of you has died or any of you has any change of address, name, or employment or any material change in financial circumstances.

**6.6 Stop Payment Order.**

**(a) How To Place One.** To place a stop payment order on a Personal Credit Line Check, call the following toll free number: 1-800-525-5678. You may also write to us in a form we approve at the address shown in Section 5.4(c). If more than one of you has signed this Agreement, any one of you may issue a stop payment order. We are not required to notify the others. All requests to stop payment must clearly identify the item. We must receive the request by the business day prior to the business day the item is presented to us.

**(b) Length Of Stop Payment.** An oral request to stop payment is only effective for fourteen (14) days, unless you confirm the request in writing in a form we approve. A written request in a form we approve will be effective for six (6) months after the date we receive it.

**(c) Reimbursement.** You agree to reimburse us for any liability we incur because we complied with your stop payment order. This includes our attorney fees and court costs. However, we will not require you to pay any amounts prohibited by applicable law. If you do not reimburse us for those amounts, you authorize us to add (debit) them to the balance in the account. If we pay the item by mistake, we may still have the right to charge you for it.

**6.7 Changes In Terms.**

**(a)** We can make the following changes to your account:

- Any change that you specifically agree to in writing at that time.
- Any change that will unequivocally benefit you through the remainder of your account.
- Any insignificant change.

**(b) Index Change For Primary Line Feature.** We have the right to change the index and margin for the Primary Line Feature if the index is no longer available. If we do that, the following rules apply:

- The new index must have an historical movement (if any) substantially similar to that of the index it replaces.
- The new index and applicable margin must result in an annual percentage rate substantially similar to the rate in effect at the time the replaced index became unavailable.
- The new index cannot be under our control and must be available to the general public.

**(c) Index Change For Personal Selection Features.** We have the right to change the index and margin we use to establish the fixed annual percentage rate when we set up any Personal Selection Feature if the index we use is no longer available at that time. If we do that, the following rules apply:

- The new index must have an historical movement (if any) substantially similar to that of the index it replaces.
- The new index and applicable margin must result in an annual percentage rate substantially similar to the rate that would have applied if the replaced index had been available.
- The new index cannot be under our control and must be available to the general public.

**(d) Substitute Index.** If any substitute index is no longer available, we have the right to change the index and margin again by following the above rules.

**(e) Errors And Corrections.** We have the right to correct any errors in the published index value.

**(f) Only A Standard.** An index is only a standard for measuring rates. It is not necessarily a rate commonly charged to any class of borrowers. Use of the word "prime" does not indicate that such rate is the best or lowest rate offered by any lender.

**6.8 Delay Or Waiver Of Our Rights.**

We may delay or waive any of our rights without losing them or diminishing their effect. This does not become a delay or waiver of any other or future occurrence. None of our employees or agents is authorized to waive any of our rights or your obligations except in writing. We may accept late payments or partial payments, even though marked "payment in full" or similar language, without losing or diminishing any of our rights.

**6.9 Information About You Or Your Property.**

You must promptly provide to us identification and verification information as required by applicable law. We may also require you to furnish us with complete financial information from time to time. You agree to do so promptly if we ask. You authorize us to obtain credit reports on you and to check your credit and employment from time to time. You authorize us to conduct appraisals and/or title searches of the property securing this account from time to time as we deem necessary. You authorize us to disclose the balance and term of your account and your payment history to others who we believe have a legitimate use for that information.

**6.10 Your Waiver.**

You waive the following formal requirements (if applicable) with respect to

amounts owed under this Agreement:

- Presentment (demand for acceptance or payment).
- Notice of dishonor (notice of refusal of another party to pay).
- Protest (formal certification of dishonor) and notice of protest.

**6.11 Assignment Of This Agreement.**
We have the right to assign this Agreement in whole or in part.

**6.12 Margin Stock Limitation.**
You agree not to use your account to purchase any "margin stock" at any time while any of you has any other purpose credit loan secured by any margin stock (as defined in Regulation U, 12 C.F.R. Part 221).

**6.13 Monthly Statements.**
Each month we will send you a statement unless your account has been inactive and you do not owe us any money or unless applicable law prohibits us from sending statements. The statement will show information about your account, including rate information, the minimum amount you must pay and when it is due. You agree to notify us promptly if you believe there are any errors or unauthorized transactions on your statement. We have no obligation to include with the monthly statement any cancelled Personal Credit Line Checks or Credit Card receipts.

**6.14 Document Retention.**
We may, in the ordinary course of business, destroy the original and/or copies of this document or any other documents in connection with your account after we make a record, copy, photograph, image or representation of it by electronic or other means for purposes of reducing paperwork storage requirements or for other business reasons. You agree that such destruction does not alter the intent of the parties to continue to be bound by the transaction that this document represents.

**6.15 Use Of Payments For Other Purposes.**
Our automated payment processing system and the volume of payments we process do not permit us to identify or respond to items sent on or with your payments. This includes messages, additional contract terms, contract modifications, limitations, restrictions, or other matters you place on or with any check or other means of payment. You agree that you will not use any check or other means of payment, or any payment stub we provide for your use, for anything other than to make a payment on this account. You waive any right you may otherwise have to do so. Among other things, this means that you cannot use any check or other means of payment or any payment stub for any of the following:

- To modify or change the terms of this Agreement or the account.
- To create any new contract or obligation, whether or not related to this Agreement or the account.
- To alter the amount due or discharge your obligation for less than the full amount due as shown in our records.
- To assert any billing error or other problem with your account.

Nothing we do will be effective or enforceable as our agreement to any such

additional provisions you may add. This includes our endorsement, acceptance, negotiation, transfer, or deposit of any check or other payment containing any such provisions. If you wish to communicate with us, you must separately write to us or call us at our customer service telephone number on the billing statements.

**6.16 Payment Conversion.**
If you pay us by check, draft, order or other written instrument, we may convert that form of payment to an electronic debit against the account on which such instrument is drawn.

**6.17 Use Of Accounts.**
(a) **Transaction With Our Affiliates.** You represent to us that you are not obtaining this account in contemplation of using funds from this account to purchase securities from or through a broker-dealer subsidiary of our holding company.

(b) **Types Of Use.** We are not responsible to any of you for how this account is used by any of you or what types of transactions any of you conduct. This includes use or transactions by any person which any of you authorize. Other than as may be required by applicable law:

- We are not required to monitor and/or prohibit transactions that any of you consider or tell us are inappropriate or imprudent.
- We are not required to notify any of you how this account is being used or what types of transactions are being conducted.

To determine how the account is being used or what types of transactions are being conducted, you should carefully review your monthly billing statements. If you want to prevent another account holder or authorized user from using this account or conducting certain types of transactions, you must cancel this account as provided in Section 5.5.

**6.18 Communications To You Including To Cell Phones.**
In order for us to service your account or to collect any amounts you owe, you agree and consent that we or a third party acting on our behalf may from time to time:

- Make telephone calls and/or send text messages to you at any telephone number(s) you give to us or that we otherwise have for you or your account, including wireless (cell phone) telephone numbers that could result in charges to you.
- Use any technology available at the time to make telephone calls and/or send text messages to you, including but not limited to the use of prerecorded/artificial voice messages and/or an automatic telephone dialing system.
- Send e-mails or any other available form of electronic communication to you at any e-mail or other electronic address you give to us or that we otherwise have for you or your account.
- Monitor and record any telephone call or other communication between you and us.

---

## YOUR BILLING RIGHTS - KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify Us In Case of Errors or Questions About Your Bill**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

- Your name and account number.
- The dollar amount of the suspected error.
- Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your Rights and Our Responsibilities After We Receive Your Written Notice**

We must acknowledge your letter within 30 days, unless we have corrected the error by then. Within 90 days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date that it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within 10 days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

**Special Rule for Credit Card Purchases**

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state, within 100 miles of your current mailing address; and
(b) The purchase price must have been more than $50.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement for the property or services.

19559.46

may take such curative action, Mortgagor's failure to comply with any of the covenants of this Mortgage or any such prior mortgage shall constitute a breach of a condition of this Mortgage.

5. To make no sale or transfer of the legal title to the Property or any equitable interest therein without obtaining prior written consent of Mortgagee. Mortgagee is under no obligation to grant consent, other than as may be required by federal law.

6. To pay Mortgagee interest at the highest rate from time to time in effect, as provided for in the Agreement, on all credit extended and all sums advanced by Mortgagee for the benefit of Mortgagor pursuant to the provisions hereof.

7. That, subject to the rights of the holder of any prior mortgage, Mortgagee is authorized to collect all damages paid and awards made as the result of the appropriation by or in lieu of eminent domain of all or part of the Property, and apply the net proceeds therefrom as a credit upon any part of the indebtedness secured hereby whether then due or thereafter becoming due.

8. That upon the occurrence of any Termination Event of Default as set forth in the Agreement, and following any notice and/or the expiration of any time period required by law, Mortgagee may declare all amounts secured by this Mortgage to be immediately due and payable without further notice or demand, and may foreclose this Mortgage by judicial proceeding in accordance with applicable law. Mortgagee shall be entitled to collect in such proceeding all costs and disbursements to which Mortgagee may become entitled by law, including but not limited to Mortgagee's attorney fees to the extent not prohibited by applicable law.

9. That upon commencement of any judicial proceeding to enforce any right under this Mortgage, the court in which such proceeding is brought, at any time thereafter, without notice to Mortgagor or any party claiming under Mortgagor (except as may be required by law), such notice being hereby expressly waived, and without reference to the then value of the Property, to the use of the Property as a homestead or to the solvency or insolvency of any person liable for the indebtedness secured hereby or other grounds for extraordinary relief, may appoint a receiver for the benefit of Mortgagee with power to take immediate possession of the Property and to manage, rent and collect the rents, issues and profits thereof, and such rents, issues and profits when collected may be applied toward the payment of any indebtedness then due and secured hereby and the payment of costs, taxes, insurance or other items necessary for the protection and preservation of the Property, including the expenses of such receivership. The interest rate as provided in the Agreement will continue before and after default, entry of judgment, and foreclosure.

10. That each of the covenants and agreements hereof shall be binding upon and shall inure to the benefit of the respective heirs, executors, administrators, successors and assigns of Mortgagor and Mortgagee. Mortgagee has the right to assign this Mortgage, and the obligations secured hereby, without notice to Mortgagor, except as may be required by law. The state and local laws applicable to this Mortgage shall be the laws of the jurisdiction in which the Property is located, except that if the Agreement specifies the law of a different jurisdiction as governing, such law shall be the applicable law governing the interest rate, fees, charges, and other terms of the credit transaction secured hereby. The foregoing sentence shall not limit the applicability of federal law to this Mortgage or to the obligations secured hereby. If more than one person is a Mortgagor, all covenants and agreements of Mortgagor hereunder shall be joint and several. Any Mortgagor who signs this Mortgage, but does not sign the Agreement: (a) is signing this Mortgage only to mortgage, grant, bargain, sell, and convey that Mortgagor's interest in the Property to Mortgagee under the terms of this Mortgage; (b) is not personally liable on the Agreement or, this Mortgage; and (c) agrees that Mortgagee and any other holder of this Mortgage may agree one or more times to extend, modify, forbear, or make any other accommodations with regard to the terms of this Mortgage or the obligations secured hereby without notice to that Mortgagor or that Mortgagor's consent and without releasing that Mortgagor or

PA DEED (PCL)

Page 3 of 6



modifying this Mortgage as to that Mortgagor's interest in the Property.

11. That this Mortgage shall remain in full force and effect notwithstanding one or more renewals, refinancings, modifications, extensions, replacements, or substitutions of the Agreement or of the terms thereof (including but not limited to any substitute or replacement credit line agreement or closed-end promissory note) and notwithstanding the fact that any such renewals, refinancings, modifications, extensions, replacements, or substitutions of the Agreement or of the terms thereof may be evidenced by a document or documents signed and dated after the date of this Mortgage or the recording of this Mortgage.

12. That no delay by Mortgagee in the exercise of any of its rights hereunder shall preclude the exercise thereof so long as Mortgagor is in default hereunder, and no failure of Mortgagee to exercise any of its rights hereunder shall preclude the exercise thereof in the event of a subsequent default by Mortgagor hereunder. Mortgagee may enforce any one or more of its rights or remedies herein successively or concurrently. If the lien of this Mortgage is invalid or unenforceable as to any part of the obligations hereby secured or as to any part of the Property, the unsecured or partially secured portion of the obligations shall be completely paid prior to the payment of the secured or partially secured portion of the obligations hereby secured. In the event any provision of this Mortgage is deemed invalid or unenforceable for any reason, such invalidity shall not affect the other provisions of this Mortgage, which shall be deemed severable and shall remain in full force and effect.

13. This Mortgage is an "Open-End Mortgage" as set forth in 42 Pa. C.S.A. § 8143 and secures obligations and future advances up to a maximum principal amount of indebtedness outstanding at any time equal to the Credit Limit, plus accrued and unpaid interest and all other sums due hereunder or secured hereby. Advances may be made and indebtedness incurred from time to time hereafter, but each such advance or indebtedness shall be secured hereby as if made on the date hereof. This Mortgage also secures (i) all advances made by Mortgagee with respect to the Property for the payment of real estate taxes, water and sewer rents, assessments, maintenance charges, insurance premiums or costs incurred for the protection of any of the Property or the lien of this Mortgage, (ii) all expenses incurred by Mortgagee by reason of a default under the Agreement or a default under this Mortgage, and (iii) all advances made by Mortgagee to enable completion of any construction of improvements to the Property. As provided in 42 Pa. C.S.A. § 8144, this Mortgage shall constitute a lien on the Property from the time this Mortgage is left of record for, among other things, all such advances and expenses, plus interest thereon, regardless of the time when such advances are made or such expenses are incurred.

14. That any notice given by Mortgagor to Mortgagee purportedly pursuant to 42 Pa. C.S.A. § 8143 shall be given by registered or certified mail, return receipt requested, to the address of Mortgagee in Columbus, Ohio specified on page 1 of this Mortgage and only to that address, and such notice shall be deemed to have been received no earlier than the date actually and physically received at such address. Mortgagor hereby covenants and agrees that it will not exercise, and hereby waives, its right under 42 Pa. C.S.A. § 8143(c) to limit the indebtedness secured by this Mortgage.

PROVIDED ALWAYS that these presents are upon the following conditions: That upon payment in full of all amounts secured by this Mortgage, including but not limited to payment in full of all indebtedness incurred under the Agreement or any renewals, refinancings, modifications, extensions, replacements or substitutions thereof or of the terms thereof, and provided that Borrower is permanently unable to obtain further loan advances under the Agreement and Borrower has returned all access devices to Mortgagee, including but not limited to any credit cards or unused checks, and all outstanding checks, credit card purchase tickets, or other items have been paid, and upon performance by Mortgagor of all of Mortgagor's covenants and agreements contained in this Mortgage, then this Mortgage shall be void and Mortgagee shall

PA DEED (PCL)



release this Mortgage without charge to Mortgagor, except that Mortgagor shall pay the cost of recording any release or satisfaction of this Mortgage.

   MORTGAGOR AND ANY MORTGAGOR'S SPOUSE who signs this Mortgage (whether or not such spouse is named in this Mortgage as a Mortgagor) do hereby waive, remise, release, and forever quitclaim unto Mortgagee any homestead or other exemption rights with respect to the Property and all rights of dower in and to the Property.

   IN WITNESS WHEREOF, this Mortgage has been executed at *101 Valley Vista Dr. State College PA 16801* this 15TH day of DECEMBER, 2017.

*Patrick M Reeder  12/15/17*

- BORROWER - PATRICK M REEDER - DATE -

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF _____*Centre*_____, ss:

   On this __*15*__ day of __*December*__, __*2017*__ (year), before me, a Notary Public, the undersigned officer, personally appeared: PATRICK M REEDER, AN UNMARRIED MAN known to me (or satisfactorily proven) to be the person(s) whose name(s) is (are) subscribed to the within instrument, and acknowledged that (he/she/they) executed the same for the purposes therein contained.

   IN WITNESS WHEREOF, I hereunto set my hand and official seal.
My commission expires: _____*OCT 13 2018*_____

_____
Notary Public

```
COMMONWEALTH OF PENNSYLVANIA
        NOTARIAL SEAL
   Susan M. Lucas, Notary Public
   Unionville Boro, Centre County
   My Commission Expires Oct. 13, 2018
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES
```

ADDRESS CERTIFICATION:

The undersigned certifies that the within named Mortgagee, THE HUNTINGTON NATIONAL BANK, has an office at 2361 Morse Road, Columbus, Ohio 43229.

_____
On Behalf of Mortgagee

PA DEED (PCL)

Page 5 of 6

PA DEED (PCL)

Page 6 of 6

MORTGAGE

FROM

_____

TO

When recorded return to:
The Huntington National Bank
P.O. Box 122620 – SW30
Covington, KY 41012-9956

_____

Rec'd for
Record _____

at _____ o'clock _____ M.

and recorded _____

THE CONDITION of this Mortgage
have been complied with, and the
same is hereby SATISFIED and
DISCHARGED this _____
day of _____

By _____

By _____



# Huntingdon County
## VIRGINIA COOPER
Register of Wills, Recorder of Deeds
and Clerk of Orphans' Court
223 Penn Street, Huntingdon, PA 16652
Phone: 814.643.2740  Fax: 814.643.6849

---

## RECEIPT FOR PAYMENT

| | |
|---|---|
| Instrument Number: 2018-000114 | Record Date: 1/09/2018 |
| Instrument Type: MORTGAGE | Record Time: 01:37:19 |
| Indexed Party: REEDER PATRICK M | Receipt No.: 60445 |

**Receipt Distribution**

Book#: 2018    Page#: 0114

| Fee/Tax Description | Payment Amount |
|---|---|
| MORTGAGE | 13.00 |
| MORTGAGE WRIT | .50 |
| JCS/ATJ/CJEA FEE | 40.25 |
| UNIV. PARCEL ID FEE | 20.00 |
| CO RECORDS IMP FND | 2.00 |
| RECORDERS FUND | 3.00 |
| EXTRA PAGES | 6.00 |
| Check# 1724665 | $84.75 |
| | |
| Total Received........ | $84.75 |

Paid By Remarks: HUNTINGTON NATIONAL BANK

Univ. Parcel ID: 31-03-111



I hereby CERTIFY that this document is
Recorded in the Recorder of Deeds Office
Of Huntingdon County, Pennsylvania.

Virginia Cooper
Recorder of Deeds

**Certification Page**
## DO NOT DETACH
This page is now part of this legal document.

NOTE: Some information subject to change during the verification process and may not be reflected on this page.